# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 28, 2023

Lyle W. Cayce
Clerk

No. 22-30168

Kholkar Vishveshwar Ganpat,

*Plaintiff—Appellee,*

*versus*

Eastern Pacific Shipping PTE, Limited, doing business as EPS,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC 2:18-CV-13556

Before Jones, Ho, and Wilson, *Circuit Judges*.

James C. Ho, *Circuit Judge*:

Litigating in a foreign country can be fraught with peril. The basic procedural and substantive protections guaranteed litigants in American courts are often taken for granted here—yet sharply limited or missing entirely before tribunals in foreign lands.

This case provides a vivid illustration: An individual brings tort and contract claims in federal court in Louisiana against a foreign corporation. In response, the corporation evades service and brings a countersuit in India,

No. 22-30168

before a court where the individual lacks counsel and is instead forced to take legal advice from the corporation's own attorneys.

Predictably, the corporation's attorneys act in direct conflict with the individual's interests. The corporation's attorneys not only pressure him to settle—they even manage to convince the foreign court to place him in prison, based on a bizarre claim that the individual does not object to imprisonment without bail while the case is pending.

In response to these alarming developments abroad, the federal district court in Louisiana unsurprisingly enters an anti-suit injunction to prevent the foreign corporation from litigating the same issues simultaneously before the court in India.

Our circuit precedents have long authorized district courts to enter anti-suit injunctions like the one entered here. *See*, *e.g.*, *Bethell v. Peace*, 441 F.2d 495, 498 (5th Cir. 1971). And our review of such anti-suit injunctions is limited to abuse of discretion. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 626 (5th Cir. 1996). Finding no abuse, we affirm.

## I.

Kholkar Vishveshwar Ganpat, a citizen of India, worked as a crew member on the *Stargate*, a merchant ship managed by the Singapore-based shipping company Eastern Pacific. When the *Stargate* stopped at Savannah, Georgia, in spring 2017, Eastern Pacific allegedly failed to stock up on anti-malarial medicine, despite warnings that the supply was low. Ganpat then contracted malaria in Gabon, the *Stargate*'s next stop—and a predictably high-risk area for malaria. When the *Stargate* arrived at Rio de Janeiro, the stop after Gabon, Ganpat went to the hospital, where his gangrenous toes—a complication of malaria—were amputated.

No. 22-30168

In December 2018, Ganpat brought suit against Eastern Pacific in the Eastern District of Louisiana, alleging tort claims under the Jones Act and general maritime law, as well as contract claims arising from a collective bargaining agreement.

Eastern Pacific waived objections to personal jurisdiction and venue. However, "[o]ver a period of approximately two and a half years, [Ganpat] attempted multiple times to perfect service upon Eastern Pacific," but the corporation "did not accept service, and, instead, filed several motions to dismiss [Ganpat's] claims . . . for insufficient service of process." *Ganpat v. E. Pac. Shipping, PTE. LTD*, No. CV 18-13556, 2022 WL 1015027, at *1 (E.D. La. Apr. 5, 2022). Ganpat thus did not perfect service on the company until August 2021.

In March 2020—after Ganpat brought his complaint and Eastern Pacific consented to federal court jurisdiction, but before Ganpat perfected service—Eastern Pacific sued Ganpat in Goa, India. In the Indian suit, Eastern Pacific sought an anti-suit injunction to prevent Ganpat from litigating in American court.[1]

The Indian court enjoined Ganpat from continuing his lawsuit in the United States. The court then issued an arrest warrant against Ganpat when he failed to comply.[2] Police officers, accompanied by the court bailiff and an

---

[1] Strangely, the dissent characterizes Ganpat as evasive and inept. *See post*, at 16, 23. Yet it was Eastern Pacific that was evasive and coercive. Ganpat simply declined to dismiss the pre-existing American suit when Eastern Pacific foisted papers on him that would have had that effect. *See Ganpat*, 2022 WL 1015027, at *3. Eastern Pacific, by contrast, sought to slow down the American suit by repeatedly refusing service. *See id.* at *1. And Eastern Pacific aimed to thwart American jurisdiction by coercing Ganpat into dropping his suit. *See id.* at *3. Eastern Pacific's whole course of conduct thus "smacks of cynicism, harassment, and delay." *Kaepa*, 76 F.3d at 628.

[2] The dissent claims that Ganpat was "jailed for his *continued refusal* to participate in the legal proceedings." *Post*, at 16. But Ganpat was actually jailed because he refused to

Eastern Pacific attorney, subsequently arrested Ganpat and brought him before the court.

As Ganpat's uncontradicted testimony shows, the post-arrest hearing was procedurally stacked against him. *See id.* at *3. Eastern Pacific had multiple lawyers. He had none. *See id.* What's worse, the judge instructed one of the Eastern Pacific attorneys to advise Ganpat. *See id.* In response, the Eastern Pacific lawyer took Ganpat aside and pressured him to settle. The lawyer then lied to the judge, absurdly claiming that Ganpat opposed his own release on bail. *See id.* Ganpat was then placed in a prison for violent criminals, where he was strip searched and held in a cramped cell. *See id.*[3]

In August 2021, back in the Eastern District of Louisiana, Ganpat sought an anti-suit injunction to prohibit Eastern Pacific from prosecuting its Indian suit against him. Finding the Indian litigation vexatious and oppressive, and determining that it need not show comity to the Indian court that had attempted to enjoin the American suit, the district court granted the injunction in favor of Ganpat. Eastern Pacific now appeals the district court's grant of the anti-suit injunction.

## II.

We review the district court for abuse of discretion. "Under this deferential standard, findings of fact are upheld unless clearly erroneous,

---

be bullied into dropping the American suit. As the factual findings of the district court indicate, Eastern Pacific and the Indian court demanded that Ganpat sign papers acknowledging the American suit was "stopped." *Ganpat*, 2022 WL 1015027, at *3. Had Ganpat given in and signed these papers, he would not have gone to jail. *See id.*

[3] The dissent does not dispute that the Indian judge instructed the attorney of Eastern Pacific, the opposing party, to advise Ganpat. Nor does the dissent dispute that the Eastern Pacific attorney then claimed that Ganpat opposed his own release on bail. And the dissent does not deny—how could it?—that this is a bizarre way for a court of law to proceed.

No. 22-30168

whereas legal conclusions are subject to broad review and will be reversed if incorrect." *Kaepa*, 76 F.3d at 626 (cleaned up).

Our standard for the grant of an anti-suit injunction weighs the vexatiousness of the foreign litigation against considerations of comity. *See id.* at 627; *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 366 (5th Cir. 2003). In this case, the vexatiousness of the foreign suit is severe—the comity considerations are, by contrast, weak. Accordingly, we see no basis to conclude that the district court abused its discretion in granting the anti-suit injunction.

## A.

Our circuit precedents authorize district courts to grant anti-suit injunctions "to prevent vexatious or oppressive litigation." *Kaepa*, 76 F.3d at 627. Three factors help courts determine whether to enjoin foreign litigation as vexatious: "(1) 'inequitable hardship' resulting from the foreign suit; (2) the foreign suit's ability to 'frustrate and delay the speedy and efficient determination of the cause'; and (3) the extent to which the foreign suit is duplicitous of the litigation in the United States." *Karaha Bodas*, 335 F.3d at 366 (footnotes omitted).

The district court here found that the Indian suit was vexatious and oppressive under our precedents.

First, the district court correctly concluded that the Indian litigation would result in inequitable hardship. As the district court noted, Ganpat "has already been jailed once for violating the ex parte antisuit injunction, and . . . faces a real possibility of being sent back to jail and having his property seized, as Eastern Pacific . . . seeks to have the Indian court enforce sixteen

counts of contempt against [Ganpat]." *Ganpat*, 2022 WL 1015027, at *8 n.104.[4]

Indeed, this is as strong a case of inequitable hardship as the previous cases where we have upheld injunctive relief. Under our caselaw, "unwarranted inconvenience [and] expense" can suffice to constitute hardship meriting an anti-suit injunction. *Kaepa*, 76 F.3d at 627. *See also In re Unterweser Reederei, Gmbh*, 428 F.2d 888, 896 (5th Cir. 1970) ("[A]llowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in 'inequitable hardship.'"), *rev'd on other grounds by M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972); *Bethell*, 441 F.2d at 498 ("[T]he court was within its discretion in relieving the plaintiff of expense and vexation of having to litigate in a foreign court."). If unwarranted inconvenience and expense present sufficient hardship to support an anti-suit injunction, surely jailtime and seizure of property also suffice.

The second vexatiousness factor—"the foreign suit's ability to 'frustrate and delay the speedy and efficient determination'" of the American suit, *Karaha Bodas*, 335 F.3d at 366—likewise favors the injunction. The Indian court has sought to prevent Ganpat from litigating in the United States, even though the American suit was filed first. This "attempt to enjoin [Ganpat] effectively translates into an attempt to enjoin the [American] court itself and to interfere with the sovereign actions of the [United States]." *Id.* at 372.

---

[4] The dissent claims that "any future threat of Ganpat's being jailed is wholly speculative." *Post*, at 22. But the likelihood of Ganpat's future arrest—not to mention the prospective seizure of his property—is the kind of factual issue on which we defer to the district court. *See Kaepa*, 76 F.3d 624 at 626.

No. 22-30168

When a foreign court tries to keep an American court from hearing a case, that frustrates the American litigation. We have reversed a district court injunction where the foreign litigation was "ineffective in curtailing the ability of . . . U.S. courts[] to enforce" the rights of the plaintiff. *Id.* at 369. There, an American court could enforce the plaintiff's rights regardless of what the foreign court did, so there was no frustration of American litigation. *See id.* Here, by contrast, the Indian court seeks to prevent the American litigation from proceeding. The district court's injunction is thus "necessary to protect the court's jurisdiction." *MacPhail v. Oceaneering Intern., Inc.*, 302 F.3d 274, 277 (5th Cir. 2002).

The Indian litigation imposes a hardship on Ganpat while frustrating the American litigation, and that is ample justification to find the Indian litigation vexatious and oppressive. Accordingly, we need not consider the third vexatiousness factor, "the extent to which the foreign suit is duplicitous of the litigation in the United States." *Karaha Bodas*, 335 F.3d at 366. *See Bethell*, 441 F.2d at 498 (upholding an anti-suit injunction on the basis of the "expense and vexation of having to litigate in a foreign court" without analyzing whether the foreign suit was duplicative).

In any event, we agree with the district court that the Indian suit is indeed duplicative. The Indian suit rests on "the same or similar legal bases" as the American suit. *Karaha Bodas*, 335 F.3d at 370. Eastern Pacific seeks to establish in Indian court by declaratory judgment the very same legal theory it raises as an affirmative defense in U.S. court—namely, that an employment agreement limits its liability to Ganpat.[5]

---

[5] The dissent invokes *MacPhail*, where we vacated the injunction in part because the foreign suit was not duplicative. *See* 302 F.3d at 277–78. There, however, the similarity between the two suits was merely factual: the legal theories at issue in the two suits were different. *See id.* Here, by contrast, the legal theories at issue in the two suits are the same.

Accordingly, all three relevant factors indicate that the Indian litigation is vexatious and oppressive.

## B.

Although our anti-suit injunction test "focuses on the potentially vexatious nature of foreign litigation, it by no means excludes the consideration of principles of comity." *Kaepa*, 76 F.3d at 627. That said, the comity considerations are not overly strict. "We decline . . . to require a district court to genuflect before a vague and omnipotent notion of comity every time that it must decide whether to enjoin a foreign action." *Id.*

Our precedents make clear that comity concerns are at a minimum where—as here—"no public international issue is implicated by the case" and "the dispute has been long and firmly ensconced within the confines of the United States judicial system." *Id.*

To begin with, no public international issues are implicated in this case. As in *Kaepa*, where we upheld the injunction, this case involves "a private party engaged in a . . . dispute with another private party." *Id.* In *Karaha Bodas*, by contrast, substantial comity concerns militated against the injunction. *See* 335 F.3d at 371–74. That's because the anti-suit injunction posed significant ramifications for a treaty to which the United States was a signatory, and one of the parties to the foreign case was a foreign state-owned enterprise. *See id.* at 373 ("[A]n injunction here is likely . . . to demonstrate an assertion of authority not contemplated by the [treaty]."); *see id.* at 372; ("[The defendant company] is wholly owned by the [foreign government]."); *id.* at 374 (upholding the district court injunction could result in

"diplomatic[]" problems). Here, no party is a government entity, and the injunction has no obvious consequences for international relations.[6]

In addition, Ganpat's case has long been ensconced in the American judicial system. Under our precedent, a case becomes ensconced in the United States when a party consents to American jurisdiction and appears in the case. *See Kaepa*, 76 F.3d at 627 (suit ensconced in the United States when defendant "consented to jurisdiction in Texas" and "appeared in an action brought in Texas"). In April 2019, Eastern Pacific appeared and waived objections to personal jurisdiction and venue. Only in March 2020, almost a year after Ganpat's suit had already become ensconced within the United States, did Eastern Pacific file its Indian lawsuit against Ganpat.

Despite the fact that the American suit was well underway before the Indian litigation began, the Indian court sought to enjoin the American

---

[6] The dissent points to the fact that "India, Singapore, and Liberia are all signatories of the 2006 Maritime Labour Convention." *Post*, at 23. The dissent then proceeds to argue that "any decision regarding Ganpat's claims will . . . necessarily implicate an international treaty." *Post*, at 24. There are two fatal problems with this argument.

First, as the dissent concedes, "the United States is not a signatory to the [Maritime Labour Convention]." *Post*, at 24 n.19. In *Karaha Bodas*, we reversed an anti-suit injunction that affected a United States treaty. *See* 335 F.3d at 373–74. The problem there was that enjoining the foreign litigation would "demonstrate an assertion of authority not contemplated by" a treaty to which the United States was party. *Id.* at 373. *See also id.* at 359–60 ("Given . . . the responsibilities of the United States under that treaty, we conclude that the district court abused its discretion."). Here, by contrast, there is no such problem.

Second, no party has argued that granting Ganpat relief under American law would cause India to violate its obligations under the 2006 Maritime Labour Convention. Eastern Pacific merely points out that an Indian legal regime, enacted pursuant to a treaty, regulates some of the relationships in this case. But the fact that India has its own "regulatory regime," *post*, at 23, does not mean that "public international issues" are in play. *Karaha Bodas*, 335 F.3d at 371. All it means is that there is a run-of-the-mill choice-of-law question—a question outside the scope of this appeal.

litigation. It would be strange to "require a district court to genuflect," *Kaepa*, 76 F.3d at 627, before a foreign court that refuses to respect the American court. In light of the "not-insubstantial" vexatiousness of the Indian litigation and the "scant" comity interests at stake, *Karaha Bodas*, 335 F.3d at 371, the district court was well within its discretion to grant the injunction.

## III.

The dissent points out that an anti-suit injunction is an "extraordinary remedy." *Post*, at 14. That is true enough. *See Karaha Bodas*, 335 F.3d at 363. Yet this extraordinary remedy was amply warranted by the extraordinary conduct of Eastern Pacific and the Indian court toward Ganpat. The dissent also makes several arguments that misconstrue our anti-suit injunction precedents. And it is to these arguments that we now turn.

## A.

The dissent first argues that this court errs by failing to employ the traditional four-part preliminary injunction test—including the requirement of irreparable injury. *Post*, at 17.

But the international anti-suit injunction precedents in our circuit do not require a showing of irreparable injury. When affirming an international anti-suit injunction, we have never discussed the traditional four-part test. *See Unterweser*, 428 F.2d at 895–96; *Bethell*, 441 F.2d at 497–99; *Kaepa*, 76 F.3d at 626–29. Nor have we ever reversed an anti-suit injunction on the basis that the district court failed to apply the traditional preliminary injunction test, including the irreparable injury prong. *See MacPhail* 302 F.3d

No. 22-30168

at 277–78; *Karaha Bodas*, 335 F.3d at 364 ("[T]he suitability of such relief ultimately depends on considerations unique to antisuit injunctions.").[7]

We recognize that other federal courts are currently split on anti-suit injunctions—some circuits such as ours take a more permissive approach, while others take a more restrictive approach. *See* Kathryn E. Vertigan, *Foreign Antisuit Injunctions: Taking A Lesson from the Act of State Doctrine*, 76 Geo. Wash. L. Rev. 155, 164–73 (2007). But even the more restrictive circuits do not necessarily require analysis of the traditional four-part test for injunctive relief. *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 17–18 (1st Cir. 2004) (rejecting the Fifth Circuit's more permissive approach and adopting the more restrictive approach); *id.* at 19 ("The lower court applied the traditional four-part test for preliminary injunctions. Because this generic algorithm provides an awkward fit in cases involving international antisuit injunctions, district courts have no obligation to employ it in that context.") (citation omitted).

**B.**

The dissent also argues that "[t]his case bears the hallmarks of those [cases] in which we vacated antisuit injunctions." *Post*, at 20. In particular, the dissent emphasizes two issues: Ganpat is an alien, and the underlying facts involve few contacts with the United States.

---

[7] Of our circuit's five published anti-suit injunction cases, four do not so much as mention the four-part test. *See Unterweser*, 428 F.2d at 895–96; *Bethell*, 441 F.2d at 497–99; *Kaepa*, 76 F.3d at 626–28; *MacPhail* 302 F.3d at 277–78. *Karaha Bodas* briefly alludes to the "four prerequisites to the issuance of a traditional preliminary injunction"—but only because the district court and the parties had discussed them. *See* 335 F.3d at 364. And *Karaha Bodas* ultimately concludes that international anti-suit injunctions are "unique." *Id.*

No. 22-30168

But only twice has this circuit vacated an international anti-suit injunction in a published opinion. *See MacPhail*, 302 F.3d at 278; *Karaha Bodas*, 335 F.3d at 375–76. And neither case makes the nationality of the party seeking the injunction, or the contacts with the United States, part of its anti-suit injunction analysis. *See MacPhail*, 302 F.3d at 277–78; *Karaha Bodas*, 335 F.3d at 366–74.

Our precedents do not ask whether the party seeking the injunction is a foreigner—or whether the underlying facts were related to the American forum. Rather, our precedents weigh the vexatiousness of the foreign litigation against considerations of comity.

If we were undertaking an analysis of personal jurisdiction or venue, contacts with the United States would surely be an appropriate consideration. *See, e.g., Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235 (5th Cir. 2022) (en banc) ("[T]he Fifth Amendment due process test for personal jurisdiction requires . . . 'minimum contacts' with the United States."); 28 U.S.C. § 1391(b) (establishing venue where "a substantial part of the events or omissions giving rise to the claim occurred" or where "defendant is subject to the court's personal jurisdiction").

But Eastern Pacific waived its objections to both personal jurisdiction and venue. Only the merits of the anti-suit injunction are at issue in this appeal.

## C.

Finally, the dissent argues that the injunction is overbroad: "It purports to bind [Eastern Pacific] India, which"—unlike Eastern Pacific— "is not a party to the U.S. action." *Post*, at 26. But the Federal Rules permit issuance of an injunction against "persons who are in active concert or participation" with parties, as well as against parties themselves. Fed. R. Civ. P. 65(d)(2)(C). "[An] injunction not only binds the parties defendant

No. 22-30168

but also those identified with them in interest . . . or subject to their control. . . . [D]efendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *United States v. Jenkins*, 974 F.2d 32, 36 (5th Cir. 1992) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).

As the district court found, "[Eastern Pacific] India is a subsidiary of Eastern Pacific . . . [and] is 99.99% owned by Eastern Pacific." *Ganpat*, 2022 WL 1015027, at *12. The district court also found "complete identity of interests and positions" between Eastern Pacific and Eastern Pacific India. *Id.* "The district court did not err in finding that it was necessary to bind" Eastern Pacific India. *Jenkins*, 974 F.2d at 36.

\* \* \*

The district court was well within its discretion to conclude that the vexatiousness of the Indian litigation outweighed any comity concerns. We accordingly affirm the anti-suit injunction.

No. 22-30168

Edith H. Jones, *Circuit Judge*, dissenting:

This circuit, to be sure, takes a more permissive approach to foreign antisuit injunctions than many of our sister circuits. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 626–27 (5th Cir. 1996).[1] Nonetheless, a foreign antisuit injunction is "an extraordinary remedy" fraught with "unique" concerns regarding international comity. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363, 364 (5th Cir. 2003). Yet the district court wheeled out this extraordinary remedy so that a sailor from India can sue a Singaporean ship management company under the Jones Act, claiming that he got malaria in Africa after his Liberian-flagged vessel docked briefly in Savannah, Georgia and received insufficient anti-

---

[1] This approach is probably wrong and should be reconsidered at an appropriate time. *See, e.g., Kaepa*, 76 F.3d at 629–34 (Garza, J., dissenting); *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 359–60 (8th Cir. 2007) ("The First, Second, Third, Sixth, and District of Columbia Circuits have adopted the 'conservative approach,' under which a foreign antisuit injunction will issue only if the movant demonstrates (1) an action in a foreign jurisdiction would prevent United States jurisdiction or threaten a vital United States policy, and (2) the domestic interests outweigh concerns of international comity."); *id.* at 360 (adopting the conservative approach because it "(1) recognizes the rebuttable presumption against issuing international antisuit injunctions, (2) is more respectful of principles of international comity, (3) compels an inquiring court to balance competing policy considerations, and (4) acknowledges that issuing an international antisuit injunction is a step that should be taken only with care and great restraint and with the recognition that international comity is a fundamental principle deserving of substantial deference." (internal quotation marks and citation omitted)).

Our precedents commence with *In re Unterweser Reederei, GmbH,* 428 F.2d 888, 890 (5th Cir. 1970), which approved a federal district court's antisuit injunction to prevent litigation in London in an admiralty dispute, while disregarding, as against "public policy," the parties' forum selection clause. *Id.* at 894. Holding that in the modern era, such clauses are to be enforced between sophisticated parties, the Supreme Court overturned this court's decision. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S. Ct. 1907 (1972). The Supreme Court's ruling gravely undermined the basis for the injunction. *See also Kaepa*, 76 F.3d at 633 n.13 (Garza, J., dissenting) (distinguishing *Unterweser* and *Bethell v. Peace*, 441 F.2d 495 (5th Cir. 1971), from modern cases).

malaria pills. The district court's decision and the majority's basis for affirming deviate severely from our precedent. I respectfully dissent.

## A. Background

It is just as inaccurate for the majority to assert that Ganpat's being sued in India, in a court located one hour from his home, is "fraught with peril," as it is to conclude that he is entitled to the potential windfall of a Jones Act recovery. The majority's criticisms of the Indian court procedures, which derive from English law, may be required to sustain their result but are unsupported by the facts.

Ganpat alleges he contracted malaria because the Liberian-flagged vessel on which he sailed was insufficiently supplied with anti-malaria pills at port in Savannah, Georgia. Falling ill at sea after docking in Africa, he was treated in Brazil, some toes were removed, and he went back home to Goa, India. Eastern Pacific Shipping India (EPS India), an Indian entity that oversaw the execution of Ganpat's seafarer employment agreement (SEA), coordinated and furnished Ganpat's medical care in Brazil and his continued care in India. In December 2018, Ganpat sued Eastern Pacific Shipping (EPS), the Singaporean ship manager for the vessel, in the New Orleans federal district court, but he failed to make proper service of process for twenty-seven months (until August 2021). The majority has no basis in the record to assert that EPS "continually evaded service of process," as EPS had every right to rely on being served according to the letter of American law and international protocol.[2]

EPS and EPS India sued Ganpat in Goa fifteen months after the U.S. suit was filed and was going nowhere. These entities sought a declaration

---

[2] The majority erroneously imply that waiver of jurisdiction and venue require a defendant also to waive correct service of process.

enforcing his employment contract, which is based on Liberian and Indian law. They obtained a temporary injunction order (in March 2020, on *forum non conveniens grounds*) to prevent Ganpat from pursuing the American suit. Ganpat admits that he repeatedly evaded service by the Indian court and was ultimately held in contempt. At the court hearing in March 2021, the Indian court offered Ganpat a court-appointed lawyer, but he rejected the offer because he did not want to pay the expense. A lawyer for EPS then spoke with Ganpat, who was accompanied by his father and brother-in-law, in an apparent attempt to negotiate his acceptance of the contracted-for injury payment. Upon reentering the courtroom, Ganpat admitted, he *refused* "three or four additional times" the judge's demand that he "sign the papers, take a bond, or hire a lawyer." *Ganpat v. Eastern Pacific Shipping, Pte. Ltd.*, 2022 WL 1015027, *3 (E.D. La. Apr. 5, 2022). He was thus jailed for his *continued refusal* to participate in the legal proceedings, not, as the majority contends, because he "refused to be bullied into dropping the American suit." The next day, he obtained counsel and bonded out. He has been represented by counsel since and has not again been threatened with jail.[3]

Ganpat further ignored the Indian court's order by pursuing the U.S. litigation in his many fruitless attempts to serve EPS properly. His efforts culminated in the U.S. district court's April 2022 antisuit injunction against both EPS and the non-party to that case, EPS India.[4]

---

[3] He admits as well that his American lawyer provided the money to hire the Indian lawyer.

[4] The district court speedily denied EPS's *forum non conveniens* motion to dismiss despite the lack of any substantial connection of this litigation to the United States. EPS and EPS India, unlike Ganpat, have complied with the foreign antisuit injunction order, and the Indian litigation is in limbo pending this dispute.

No. 22-30168

The district court described EPS's Indian suit as a "stratagem," and the majority imply without any record evidence that the Indian legal system lacks legal protection for Ganpat. When this tortured procedural history is considered in toto, it is more accurate to describe the district court's rulings as an attempt to compel domestic jurisdiction over a suit with highly tenuous domestic connections.

## B. Standard for Foreign Antisuit Injunctions

Antisuit injunctions in this circuit are described as a subspecies of injunctions. *Karaha Bodas*, 335 F.3d at 364. The majority discounts that Ganpat, like any movant for equitable relief, must ultimately satisfy a four-part test and show a likelihood of success on the merits.[5] The fact that unique considerations affect the propriety of foreign court antisuit injunctions should not detract from the recognition that equitable relief requires an extraordinary justification. Consequently, our cases explain the need to weigh preventing "vexatious or oppressive litigation" and "protecting the court's jurisdiction" against deference to principles of international comity. *See, e.g., id.* at 366; *see also Kaepa*, 76 F.3d at 627; *MacPhail v. Oceaneering Int'l*, 302 F.3d 274, 277 (5th Cir. 2002).[6] Elaborating on what is vexatious, we have identified: (1) inequitable hardship resulting from the foreign suit;

---

[5] *See Karaha Bodas*, 335 F.3d at 364 & n.19 (asserting that the court's anti-suit injunction standard acts as a substitute for the traditional standard's "likelihood of success" prong but intimating that the remaining factors of the traditional standard may be applicable); *see also MWK Recruiting, Inc. v. Jowers*, 833 F. App'x 560, 562 (5th Cir. 2020) (per curiam).

[6] The factors to be weighed seem to compress a four-factor test articulated by this court in *Unterweser, i.e.*, whether the foreign litigation would (1) frustrate a policy of the U.S. forum; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) cause prejudice or offend other equitable principles. *See* 428 F.2d at 890.

No. 22-30168

(2) the foreign suit's ability to frustrate and delay the speedy and efficient determination of the cause; and (3) the extent to which the foreign suit is duplicitous of the U.S. litigation. *Karaha Bodas*, 335 F.3d at 366. And *Karaha Bodas* clarified that this inquiry goes to the first traditional factor: likelihood of success on the merits. *Id.* at 364 & n.19. Ultimately, the unique aspects of foreign antisuit injunctions must relate to the challenging tests for equitable relief.

The majority opinion, unfortunately, reduces this "extraordinary remedy" essentially to a routine order under a routine multifactor test. The majority's analysis finds "inequitable hardship" if Ganpat must endure litigating the Indian lawsuit; and it finds "frustration" of the American litigation because the "Indian court has sought to prevent Ganpat from litigating in the United States, even though the American suit was filed first." With these sole prerequisites, the majority declares it unnecessary to consider "the extent to which the foreign suit is duplicitous of the litigation in the United States." *Karaha Bodas*, 335 F.3d at 366. But the majority then endorses the district court's statement that the Indian suit rests on "the same or similar legal bases." Each of these findings is incorrect, as is the majority's minimization of international comity concerns and its further refusal to apply traditional equitable principles. A look at our previous case law concerning foreign antisuit injunctions readily demonstrates the majority's departure from the underlying standards we have used.

## 1. "Vexatiousness"

First, contrary to the majority's dismissive math, half of the antisuit injunctions issued in this circuit have been vacated on appeal. Of this

No. 22-30168

circuit's six opinions covering antisuit injunctions, three upheld and three vacated district court orders.[7]

Our cases share several common themes, and they uniformly point toward rejecting the district court's injunction in this case. Where we have upheld antisuit injunctions, the defendant in the foreign proceeding was a United States citizen or company[8]; the facts giving rise to the dueling actions bore a substantial relationship to the United States forum[9]; and the dueling actions involved identical parties and nearly identical, if not identical claims.[10] In contrast, where this court vacated antisuit injunctions, the

---

[7] Those cases in which we have upheld antisuit injunctions are *Unterweser*, 428 F.2d 888 (5th Cir. 1970), *rev'd by M/S Bremen*, 407 U.S. 1, 92 S. Ct. 1907 (1972); *Bethell*, 441 F.2d 495 (5th Cir. 1971); and *Kaepa*, 76 F.3d 624 (5th Cir. 1996). Those cases in which we have vacated antisuit injunctions are *MacPhail*, 302 F.3d 274 (5th Cir. 2002); and *Karaha Bodas*, 335 F.3d 357 (5th Cir. 2003). The most recent such case vacating an injunction is well reasoned but unpublished. *MWK Recruiting*, 833 F. App'x 560 (5th Cir. 2020) (per curiam).

[8] *Unterweser*, 428 F.2d at 889; *Bethell*, 441 F.2d at 496; *Kaepa*, 76 F.3d at 625.

[9] *Unterweser*, 428 F.2d at 889 (ship docked in Florida after accident in Gulf of Mexico while transporting drilling barge from Louisiana to Italy); *Bethell*, 441 F.2d at 496 (contract signed in Florida by Florida residents while defendant was acting in capacity as Florida real estate broker, which gave rise to fiduciary duties under Florida law); *Kaepa*, 76 F.3d at 625–26 (Japanese company contracted with U.S. company and agreed to litigate disputes in United States).

[10] *Unterweser*, 428 F.2d at 889 (U.S. company sued German company in federal district court for damages; German company then sued U.S. company in England for moneys due under towage contract and for breach of contract); *Kaepa*, 76 F.3d at 625–26 (U.S. company sued Japanese company in federal district court for fraudulent and negligent inducement as well as breach of contract; Japanese company sued U.S. company in Japan on identical claims); *see also Bethell*, 441 F.2d at 496 (Florida real estate broker sued owners in Bahamas to enforce contract to sell property and to quiet title; Texas co-owner sued real estate broker in federal district court for fraud and declaratory judgment as to validity of the contract); *id.* at 498–99 (narrowing scope of injunction because it "attempt[ed] to affect rights between [real estate broker] and co-owners who were not parties to the [U.S.] action").

defendant in the foreign proceeding was a foreigner[11]; the facts underlying the actions were largely unrelated to the United States forum[12]; the parties were not identical[13]; and, though the dueling cases arose out of the same underlying facts, they involved different legal claims.[14]

This case bears the hallmarks of those in which we vacated antisuit injunctions. First, all parties are foreign to the United States. The only connection this case has to the United States, besides Ganpat's lawyer, is Ganpat's allegation that EPS, a Singaporean ship manager, failed to supply the *M/V Stargate*, a Liberian-flagged vessel, with enough anti-malaria medication while briefly in port at Savannah, Georgia. Ganpat has remained in India since his repatriation. He couldn't even be bothered to personally attend the dispositive hearing on the district court's antisuit injunction. The court permitted him to appear by Zoom from India.

Even more significant, the parties to each action are *not* the same and the cases involve *different* legal claims. In the New Orleans district court,

---

[11] *MacPhail*, 302 F.3d at 276 & n.2; *Karaha Bodas*, 335 F.3d at 360.

[12] *MacPhail*, 302 F.3d at 275–76 (injuries in South China Sea resulted in settlement agreement between U.S. company and Australian that was signed in Australia and confirmed by Australian court); *Karaha Bodas*, 335 F.3d at 360–61 (arbitration award from Switzerland arising out of failed construction contract between Caymanian company and state-owned Indonesian company).

[13] *Karaha Bodas*, 335 F.3d at 362. *But see MacPhail*, 302 F.3d at 277 (identical parties).

[14] *MacPhail*, 302 F.3d at 277 (U.S. action sought damages from maritime tort claim, whereas Australian action sought specific performance of settlement agreement); *Karaha Bodas*, 335 F.3d at 361 (U.S. action sought confirmation of award, whereas Indonesian action sought annulment of award); *see also MWK Recruiting,* 833 F. App'x at 564 (rejecting use of the "logical relationship test" to determine duplicative claims).

No. 22-30168

Ganpat sued only EPS for damages under the Jones Act, the collective bargaining agreement, and general maritime law. In India, EPS and EPS India filed suit for a declaration that Ganpat's damages are limited by the SEA Ganpat executed with Ventnor Navigation, Inc. through Ventnor's authorized representative, EPS India.[15] But EPS India is not a party to the U.S. litigation.

Although the majority assert that it is unnecessary to discuss whether the parties' claims in each case are "duplicitous," they go on to endorse the district court's finding that the cases rest on the same or similar legal claims. What the majority means is thus unclear. But the inquiry into legal overlap between the domestic and foreign proceedings has been a basic and indispensable feature of previous cases. Indubitably, the parties here are proceeding on distinct legal claims. Ganpat has no recourse to the Jones Act's remedies in Indian courts. And although EPS in the district court asserted as an affirmative defense that the SEA limited Ganpat's damages, these actions "share the same or similar legal bases" only to the extent that the resolution of one case *may* serve "as the basis for a plea of res judicata" in the other case. *Ganpat*, 2022 WL 1015027 at *10, *11. Res judicata is hard to imagine, however, because any rejection of the SEA by the district court (were that to occur) is unlikely to be enforced against *EPS India*, a nonparty over which the district court lacked jurisdiction, via its judgment solely against EPS.

The district court reasoned otherwise by asserting simply that the SEA is at issue in both the U.S. and Indian fora. Such a superficial factual analogy has been repeatedly rejected by this court because "the duplicative factor [relating to vexatiousness] is about *legal*, not *factual*, similarity."

---

[15] That agreement is governed by Liberian and Indian law and covered work on the *M/V Stargate,* which EPS managed.

No. 22-30168

*MWK Recruiting, Inc. v. Jowers*, 833 F. App'x 560, 564 (5th Cir. 2020) (per curiam) (emphasis in original); *see also Karaha Bodas*, 335 F.3d at 370; *Kaepa*, 76 F.3d at 626 ("mirror-image" claims in foreign suit and U.S. suit). *MacPhail*, in fact, rejected the exact argument made by the district court here, holding the assertion of a *defense* in U.S. proceedings that serves as the basis for a *claim* in foreign proceedings does not render the actions duplicitous. 302 F.3d at 277. And indeed, preventing these parties from proceeding on different claims in the U.S. and India makes no sense. The district court is powerless to compel a complete resolution of the three parties' dispute before its bench; and the parties are prevented from going forward in India's dispositive litigation with EPS India. The majority's analysis thus evades what should be a *sine qua non* to justify a foreign antisuit injunction.[16]

Properly applying our precedents to the facts at hand, it seems plain that Ganpat does not suffer "inequitable hardship" from being involved in parallel litigation, a course his actions foreordained. Parallel proceedings, alone, are insufficient to show vexation or oppression. *Karaha Bodas*, 335 F.3d at 372 & n.59; *see also MWK Recruiting*, 833 F. App'x at 564. The Indian court is doubtlessly a *forum conveniens*. And any future threat of Ganpat's being jailed is wholly speculative, as he has obtained counsel in India. *Karaha Bodas*, 335 F.3d at 368–69 (no inequitable hardship where asserted harm was speculative). It is likewise speculative that the Indian suit could have frustrated or delayed the district court's proceedings. The district court certainly had means to defend its jurisdiction that fell short of requiring EPS and EPS India to abandon the Indian action entirely. *See id.* at

---

[16] Contrary to the majority's assertion, this court has never found that "inconvenience [and] expense" alone can justify a foreign anti-suit injunction. By that standard, *any* foreign suit could be enjoined. The inconvenience and expense of foreign litigation is instead only "unwarranted" where the foreign action is duplicative of the domestic action. *Kaepa*, 76 F.3d at 627–28.

361–62 (district court required the plaintiff in foreign case to withdraw application for antisuit injunction and prohibited plaintiff from taking any substantive action in foreign case, but it allowed plaintiff to "take any ministerial steps necessary to maintain the cause of action."). And it was Ganpat, not EPS or the Indian court, who delayed his American case for over two years with inept dithering about proper service of process. Finally, the current posture of these cases prevents either court from fully resolving the three parties' differences, and this means the legal claims cannot be substantially similar. It was error to deem the pendency of the Indian lawsuit "vexatious and oppressive" to Ganpat.

### 2. Comity

On the other side of the equitable ledger, international comity concerns here decidedly outweigh the need to "prevent vexatious or oppressive litigation" and "to protect the court's jurisdiction."[17] To begin, India, Singapore, and Liberia are all signatories of the 2006 Maritime Labour Convention (MLC).[18] That treaty embodies "as far as possible all up-to-date standards of existing international maritime labour Conventions and Recommendations, as well as the fundamental principles to be found in other international labour Conventions." MLC, 2006, preamble. In accordance with its duties under the treaty, India promulgated a complex regulatory regime that governs the relationship among EPS, EPS India, and Ganpat. For instance, EPS India exists because Indian law prevents a foreign company from employing Indian nationals to work on a foreign flagged ship without

---

[17] *Karaha Bodas* makes clear that while "notions of comity do not wholly dominate our analysis," the court must still weigh the "need to defer to principles of international comity." 335 F.3d at 366; *see also Kaepa*, 76 F.3d at 627.

[18] *Ratifications of MLC, 2006*, International Labour Organization https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:11300:0::NO::P11300_INSTRUMENT_ID:312331 (last visited Apr. 13, 2023).

No. 22-30168

the involvement of a locally licensed placement service.  Consequently, any decision regarding Ganpat's claims will, as in *Karaha Bodas*, necessarily implicate an international treaty and foreign states' rules promulgated thereunder.[19]

Comity concerns, however, do not only arise where public international relations are at stake.  Such a holding would place this court's precedent well outside the norm.  Indeed, even circuits friendly to this court's approach to antisuit injunctions acknowledge there are "international-comity concerns inherent in enjoining a party from pursuing claims in a foreign court." *1st Source Bank v. Neto*, 861 F.3d 607, 613 (7th Cir. 2017).[20]  Those inherent concerns are on full display here.  In March 2020, seventeen months *before* service was perfected in the district court, the Indian court determined that it had jurisdiction over the dispute and the parties, was a convenient forum, and should temporarily enjoin Ganpat from his U.S. litigation.  In April 2022, two years *after* the Indian court's order, the district court issued its foreign antisuit injunction in the face of Ganpat's ongoing disregard of the Indian court's order.[21]  Had Ganpat instead litigated on the merits in the Indian court, this case might have been concluded already, albeit

---

[19] Although the United States is not a signatory to the MLC, surely U.S. courts ought to proceed carefully before ignoring treaties and foreign statutes, especially those governing employment relationships. Yet the majority seem to deride this aspect of comity. *See, e.g., Goss Int'l*, 491 F.3d at 366 (vacating injunction because "[i]nternational comity requires us to give deference to the Japanese courts to interpret Japanese laws").

[20] As the Sixth Circuit observed, an antisuit injunction in and of itself "conveys the message, intended or not, that the issuing court has so little confidence in the foreign court's ability to adjudicate a given dispute fairly and efficiently that it is unwilling even to allow the possibility." *Gau Shan Co. v. Bankers Trust Co.*, 956 F.2d 1349, 1355 (6th Cir. 1992).

[21] Indeed, the district court's course of conduct greenlit Ganpat's contempt by allowing him to continue prosecuting the U.S. action in apparent defiance of the Indian court's order.

on terms he might not have found attractive. But as noted above, the district court's injunction forced EPS and EPS India to dismiss the Indian action. In short, the district court's actions not only clashed "with the general principle that a sovereign country has the competence to determine its own jurisdiction and grant the kinds of relief it deems appropriate," but also "effectively attempt[ed] to arrest the judicial proceedings of another foreign sovereign." *Karaha Bodas*, 335 F.3d at 371, 372–73. The fact that the Eastern District of Louisiana maintains absolutely zero factual connection to the dispute only exacerbates the violation of comity.

The *MacPhail* case provides an excellent parallel. There, an Australian citizen suffered injuries while working in the South China Sea. 302 F.3d at 275. Three years later, he brought a general maritime tort claim against an American company in federal district court. *Id.* at 276. The company proffered a prior settlement agreement between the parties as a defense. *Id.* When the district court rejected the agreement as unenforceable, the company brought an action in Australia seeking specific performance of the agreement. *Id.* at 277. The district court issued an antisuit injunction, and the company appealed. *Id.* This court first held that the actions were not duplicitous: Although both actions arose "out of facts contemplated" by the agreement, the actions did not involve identical claims. *Id.* It also held that the foreign action was not vexatious considering the Australian citizen had previously resorted to Australia's courts to confirm the agreement. *Id.* And it rejected the contention that the antisuit injunction was necessary to protect the district court's jurisdiction because the Australian court established "prima facie jurisdiction" before the federal district court and nothing prevented the Australian citizen from opposing the validity of the agreement in the Australian courts. *Id.* at 277–78. The court consequently vacated the antisuit injunction. *Id* at 278.

Like *MacPhail*, the case at hand bears almost no relationship to the United States.  The claims at issue in the domestic and foreign litigation are not identical.  And though the district court here assumed jurisdiction over the case earlier than the Indian court, the domestic case lay dormant for years due to Ganpat's dilatory conduct.  In the meantime, the Indian court established jurisdiction and preliminarily found itself to be a *forum conveniens*.  The significant international comity interests at issue here, which were not present in *McPhail*, go well beyond those inherent in enjoining foreign litigation and further weigh in favor of vacating the antisuit injunction.

### 3. Equitable Considerations

As a final instance of abuse, the district court failed to balance the equities traditionally important to granting injunctive relief, as it should have done after finding Ganpat had shown a likelihood of success on the merits.  Moreover, the district court failed to "narrowly tailor" the injunction "to remedy the specific action" that gave rise to its order.  *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).  The injunction purports to bind EPS India, which is not a party to the U.S. action.  Though Rule 65 of the Federal Rules of Civil Procedure permits a court to bind non-parties "who are in active concert or participation with" a party against whom an injunction is issued, the district court must first find that the non-party is "so identified in interest with those named in the decree that it would be reasonable to conclude that their rights and interests have been represented and adjudicated in the original injunction proceeding."  *Harris Cnty. v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 314 (5th Cir. 1999) (citation omitted).  Despite the fact that EPS India is a wholly owned subsidiary of EPS, EPS India may have different obligations to Ganpat and might have claims EPS is unable to assert.  For instance, Ganpat has argued the SEA does not govern his relationship with EPS.  Consequently, it was an abuse of discretion to bind EPS India.  *See Bethell*, 441 F.2d at 498 (scope of injunction

No. 22-30168

overbroad where it "attempts to affect rights between" defendant in U.S. action and those "who were not parties to the" district court action). The court also brazenly required EPS and EPS India to dismiss the Indian action, as opposed to requiring them, for example, to ask the Indian court to abandon its injunction. *See Karaha Bodas*, 335 F.3d at 361. The injunction's terms are abusive, especially if the Indian statute of limitations could prevent EPS and EPS India from refiling their claim.

Returning to the theme that injunctive relief is to be sparingly granted, and only when the balance of hardships clearly weighs in favor of the movant and against the respondent, [22] I believe the foregoing discussion demonstrates the legal and factual errors underpinning the district court's foreign antisuit injunction. I respectfully dissent.

---

[22] *See Karaha Bodas*, 335 F.3d at 363–64 & n.19; *see also MacPhail*, 302 F.3d at 277–78; *MWK Recruiting*, 833 F. App'x at 562, 564–65.